AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT

**10/8/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ CDO _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**F I L E D**
CLERK, U.S. DISTRICT COURT

**10/08/2024**

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ AF _____ DEPUTY

| | |
|---|---|
| United States of America, | |
| Plaintiff, | |
| v. | Case No.   2:24-mj-06166-DUTY |
| IBRAHIM AMEEN ALHUSSEINI, | |
| Defendant. | |

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of at least January 2020 through to the present in the county of Los Angeles in the

Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 15 U.S.C. §§ 78j(b), 78ff | Manipulative and Deceptive Devices |
| 17 C.F.R. § 240.10b-5 | Employment of Manipulative and Deceptive Devices |

This criminal complaint is based on these facts:
 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Richard Higgins*
*Complainant's signature*

_____
Richard Higgins, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   October 8, 2024          _____
                                  *Judge's signature*

City and state:   Los Angeles, California          Honorable Alka Sagar, U.S. Magistrate Judge
                                                    *Printed name and title*

AUSA: Brett Sagel (714-338-3598)

## AFFIDAVIT

I, RICHARD HIGGINS, being duly sworn, declare and state as follows:

### I.    PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint and arrest warrant for IBRAHIM AMEEN ALHUSSEINI ("ALHUSSEINI") for a violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 (Securities Fraud).[1]

2.    The facts set forth in this affidavit are based upon my participation in the investigation, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and arrest warrant and does not purport to set forth all of my

---

[1] Ninth Circuit Model Criminal Jury Instruction 15.47 states that for a defendant to be found guilty of securities fraud under 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, the government must prove each of the following elements beyond a reasonable doubt:

(1)    The defendant willfully (i) used a device or scheme to defraud someone, (ii) made an untrue statement of a material fact, (iii) failed to disclose a material fact that resulted in making the defendant's statements misleading, or (iv) engaged in any act, practice, or course of business that operated or would operate as a fraud or deceit upon any person;

(2)    The defendant's acts were undertaken, statements were made, or failure to disclose was done in connection with the purchase or sale of a security;

(3)    The defendant directly or indirectly used the means and instrumentalities of interstate commerce in connection with these acts, making the statements, or the failure to disclose; and

(4)    The defendant acted knowingly.

1

knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are relayed in substance and in part only, and all dates are on or about those indicated.

## II. **BACKGROUND OF FBI SPECIAL AGENT RICHARD HIGGINS**

3.    I am a Special Agent with the Federal Bureau of Investigation where I have been employed since April 2021. Since approximately September 2021, I have been assigned to the Los Angeles Field Office, Corporate and Securities Fraud Squad. I am responsible for investigating white-collar crimes, such as corporate fraud and securities fraud, and I have led and/or participated in several white-collar fraud investigations. During the course of my duties, I have participated in the execution of several search and arrest warrants.

4.    Prior to joining the FBI, I was an accountant at a certified public accounting firm called McCarthy & Company PC. My work at McCarthy consisted primarily of performing financial statement audits and reviews of companies in the construction industry. In that capacity, I thoroughly reviewed financial documentation to ensure the accuracy of the company's financial statements. I also have a master's degree in forensic accounting from Stevenson University.

//

//

2

### III.  SUMMARY OF PROBABLE CAUSE

5.    In or around January 2020, and continuing through to the present, within the Central District of California and elsewhere, as part of a device and scheme to defraud, ALHUSSEINI made untrue statements of material fact in connection with the purchase and sale of certain securities.

6.    Specifically, ALHUSSEINI provided falsified financial statements to two investor funds ("INVESTOR FUND A" and "INVESTOR FUND B").  The falsified financial statements inflated ALHUSSEINI's personal wealth by tens of millions of dollars and induced INVESTOR FUND A and INVESTOR FUND B to each purchase a put option, a type of security within the meaning of Section 3(a)(10) of the Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), from ALHUSSEINI.

7.    As a result of ALHUSSEINI's fraud, ALHUSSEINI received more than $12 million in personal gain, and INVESTOR FUND B lost at least $150 million.

### IV.  STATEMENT OF PROBABLE CAUSE

#### A.  Background on Relevant Individuals and Entities

8.    IBRAHIM AMEEN ALHUSSEINI was, at relevant times, a resident of Los Angeles, California, and a citizen of the United States.

9.    BORROWER 1 was, at relevant times, a resident of Los Angeles, California, within the Central District of California,

and a co-founder and shareholder of COMPANY A. BORROWER 1 also serves on the board of directors of an entity that ALHUSSEINI controls.

10. COMPANY A maintained its principal office in Los Angeles County, California, within the Central District of California. ALHUSSEINI served on the board of directors of COMPANY A.

11. INVESTOR FUND A was an investment fund that loaned investors' capital to high-net-worth borrowers.

12. INVESTOR FUND B was an investment fund that loaned investors' capital to high-net-worth borrowers.

13. INVESTMENT ADVISER 1 was a securities investment adviser that advised INVESTOR FUND A and INVESTOR FUND B, and maintained offices in New York, New York.

14. BROKER 1 was a registered securities broker-dealer and had its headquarters in Boston, Massachusetts.

15. ALHUSSEINI RELATIVE 1 was a relative of ALHUSSEINI and a resident of Saudi Arabia.

**B.    ALHUSSEINI Sold a $55 Million Put Option to INVESTOR FUND A**

16. Based on my review of records from INVESTMENT ADVISER 1, in or around February and March 2020, INVESTMENT ADVISER 1 negotiated the terms of a $55 million loan from INVESTOR FUND A to BORROWER 1, who was an associate of ALHUSSEINI's, via BORROWER 1's closely held company. Under the terms of the loan, BORROWER 1

pledged approximately 10.3 million shares of stock in COMPANY A as collateral.

17. As a condition of making the loan to BORROWER 1, INVESTMENT ADVISER 1 negotiated for INVESTOR FUND A to purchase a put option from ALHUSSEINI and two corporate entities that ALHUSSEINI controlled (the "March 2020 put option").

18. The put option acted as a form of a financial guarantee on the $55 million loan from INVESTOR FUND A to BORROWER 1 by mitigating the risk to INVESTOR FUND A if BORROWER 1 defaulted on the loan. INVESTOR FUND A's $55 million loan to BORROWER 1 was contingent on INVESTOR FUND A entering into the March 2020 put option agreement with ALHUSSEINI.

19. The March 2020 put option contractually required ALHUSSENI to pay $55 million to INVESTOR FUND A if BORROWER 1 defaulted on the $55 million loan. Specifically, in the event of BORROWER 1's default on the loan, ALHUSSEINI was obligated to purchase the approximately 10.3 million shares of Company A stock that BORROWER 1 pledged against the $55 million loan as collateral.

20. COMPANY A was a non-public company, and there was not a liquid market to sell COMPANY A stock. As a result, INVESTOR FUND A sought the March 2020 put option as a hedge against the risk that COMPANY A's shares could not be sold at a value equal or greater to the value of the $55 million loan.

21.  Because  the  put  option  contractually  obligated
ALHUSSEINI to purchase the COMPANY A stock for $55 million in the
event that BORROWER 1 defaulted on the loan, the terms of the March
2020 put option required that ALHUSSEINI have sufficient assets to
pay $55 million to INVESTOR FUND A in the event of BORROWER 1's
default.  Relevant here, the put option required that ALHUSSEINI
and the two co-signing entities controlled by ALHUSSEINI maintain
a collective total net worth of $137,500,000 and a liquid net worth
of $68,750,000.

22.  In selling INVESTOR FUND A the March 2020 put option,
ALHUSSEINI made untrue statements of material fact to INVESTOR
FUND A about ALHUSSEINI's personal wealth, and ALHUSSEINI provided
INVESTOR FUND A with falsified account statements for brokerage
accounts in ALHUSSEINI's name held at BROKER 1.  The falsified
brokerage statements falsely inflated the value of the assets in
ALHUSSEINI's BROKER 1 accounts by tens of millions of dollars.

23.  On or about March 10, 2020, ALHUSSEINI sent a document
via email to INVESTMENT ADVISER 1 that ALHUSSEINI falsely claimed
was a true and accurate securities brokerage account statement as
of December 31, 2019, of ALHUSSENI's investment portfolio with
BROKER 1.  ALHUSSEINI's falsified BROKER 1 account statement
falsely stated that ALHUSSEINI held more than $86 million in
securities in accounts at BROKER 1.

24.   In fact, ALHUSSEINI's BROKER 1 account statements show that as of December 31, 2019, ALHUSSEINI's BROKER 1 accounts held a total of approximately $4,390.10.

25.   On or about March 16, 2020, INVESTOR FUND A purchased a put option from ALHUSSEINI that obligated ALHUSSEINI to pay $55 million for the collateral 10.3 million shares of COMPANY A stock in the event BORROWER 1 defaulted on the $55 million loan.

26.   Under the terms of the March 2020 put option, approximately $6 million of the $55 million loan was to be paid to ALHUSSEINI at the time of the loan's execution as consideration (also known as a "premium payment") for guaranteeing BORROWER 1's repayment of the loan.[2]

## C.   ALHUSSEINI Sold a $65 Million Put Option to INVESTOR FUND B

27.   On or about November 4, 2021, BORROWER 1 refinanced the loan against his 10.3 million shares of COMPANY A stock.  Under the refinanced loan, INVESTOR FUND B loaned $145 million to BORROWER 1, and BORROWER 1 pledged approximately 10.3 million shares of COMPANY A stock as collateral.

---

[2] Although the terms of the March 2020 put option state that a $6 million premium payment would be made to ALHUSSEINI, based on a review of bank records, I know that on March 17, 2020, BORROWER 1 sent $2 million to an entity controlled by ALHUSSEINI.  And from March 18 to 19, 2020, BORROWER 1 sent $5 million to a bank account in Saudi Arabia held in the name of ALHUSSEINI RELATIVE 1.  It thus appears that ALHUSSEINI received more than $6 million in connection with the March 2020 put option.

28.   As a condition of making the refinanced $145 million loan to BORROWER 1, INVESTMENT ADVISER 1 negotiated for INVESTOR FUND B to purchase a new put option from ALHUSSEINI, in which ALHUSSEINI was obligated to pay $65 million to INVESTOR FUND B in the event that BORROWER 1 defaulted on the $145 million loan (the "November 2021 put option").

29.   On or about November 4, 2021, ALHUSSEINI caused his agent to send an email to INVESTMENT ADVISER 1 that contained a document that ALHUSSEINI falsely claimed was a true and accurate account statement as of September 30, 2021, of ALHUSSENI's investment portfolio with BROKER 1.  This falsified BROKER 1 account statement falsely stated that ALHUSSEINI held more than $199 million in securities in accounts at BROKER 1.

30.   In fact, ALHUSSEINI's BROKER 1 account statements show that as of September 30, 2021, ALHUSSEINI's BROKER 1 accounts held a total of approximately $2,693.63.

31.   On or about November 4, 2021, INVESTOR FUND B purchased a put option from ALHUSSEINI that obligated ALHUSSEINI to pay $65 million for the collateral 10.3 million shares of COMPANY A stock in the event BORROWER 1 defaulted on the $145 million loan. The terms of the November 2021 put option required that ALHUSSEINI have sufficient assets to pay $65 million to INVESTOR FUND A in the event of BORROWER 1's default.

32.  Under the terms of the November 2021 put option, approximately $6.3 million was to be paid to ALHUSSEINI at the time of execution as a premium payment in consideration for guaranteeing BORROWER 1's repayment of the loan.[3]

**D.   Each Month, ALHUSSEINI Sent Falsified Brokerage Account Statements to INVESTMENT ADVISER 1**

33.  To maintain and conceal ALHUSSEINI's deception of INVESTMENT ADVISER 1, INVESTOR FUND A, and INVESTOR FUND B, ALHUSSEINI submitted or caused to be submitted falsified brokerage statements to INVESTMENT ADVISER 1 on at least 24 occasions between in or around April 2020 and in or around February 2023.

34.  I have reviewed BROKER 1 brokerage account statements that ALHUSSEINI provided or caused to be provided to INVESTMENT ADVISOR 1.  I have also reviewed copies of ALHUSSEINI's BROKER 1 brokerage account statements provided by BROKER 1.

35.  Based on my review, ALHUSSEINI's falsified brokerage statements were altered to falsely represent that ALHUSSEINI's brokerage account held highly liquid and publicly tradeable securities that were, depending on the month and year, worth between approximately $80 million to $200 million.  In fact, ALHUSSEINI's brokerage account during this period held between approximately $2,000 and $15,000.

---

[3] ALHUSSEINI directed INVESTOR FUND B to remit the $6.3 million premium payment to a trust account controlled by ALHUSSEINI's attorney for the benefit of an entity that ALHUSSEINI controlled.

36. For example, ALHUSSEINI sent or caused to be sent falsified account statements purportedly from BROKER 1 as set out in the table below:

| # | Date of Transmission | End Date of Investment Report | Falsified Portfolio Value | Actual Portfolio Value |
|---|---|---|---|---|
| 1 | April 10, 2020 | March 31, 2020 | $79,321,735.43 | $2,693.27 |
| 2 | May 11, 2020 | April 30, 2020 | $97,429,680.43 | $2,693.29 |
| 3 | June 10, 2020 | May 31, 2020 | $102,567,499.43 | $2,693.31 |
| 4 | July 11, 2020 | June 30, 2020 | $116,953,270.43 | $2,693.33 |
| 5 | October 10, 2020 | September 30, 2020 | $174,360,609.43 | $2,693.39 |
| 6 | January 11, 2021 | December 31, 2020 | $189,376,809.43 | $2,693.45 |
| 7 | February 10, 2021 | January 31, 2021 | $188,259,360.43 | $2,693.47 |
| 8 | March 10, 2021 | February 28, 2021 | $183,658,403.43 | $2,693.49 |
| 9 | April 11, 2021 | March 31, 2021 | $187,101,939.43 | $2,693.51 |
| 10 | May 10, 2021 | April 30, 2021 | $194,988,057.43 | $2,693.53 |
| 11 | June 11, 2021 | May 31, 2021 | $193,759,003.43 | $2,693.55 |
| 12 | July 12, 2021 | June 30, 2021 | $201,638,274.43 | $2,693.57 |
| 13 | August 12, 2021 | July 31, 2021 | $206,835,414.43 | $2,693.59 |
| 14 | September 13, 2021 | August 31, 2021 | $209,309,993.43 | $2,693.61 |
| 15 | October 11, 2021 | September 30, 2021 | $199,928,668.43 | $2,693.63 |

| 16 | January 10, 2022 | December 31, 2021 | $218,698,707.43 | $2,693.69 |
| 17 | April 13, 2022 | February 28, 2022 | $202,940,146.43 | $3,676.27 |
| 18 | May 12, 2022 | April 30, 2022 | $194,772,983.43 | $5,643.31 |
| 19 | June 13, 2022 | May 31, 2022 | $186,785,474.43 | $6,651.98 |
| 20 | July 14, 2022 | June 30, 2022 | $177,728,473.43 | $7,654.81 |
| 21 | August 13, 2022 | July 31, 2022 | $190,915,824.43 | $8,655.87 |
| 22 | September 13, 2022 | August 31, 2022 | $186,010,608.43 | $9,641.54 |
| 23 | October 18, 2022 | September 30, 2022 | $173,050,354.43 | $10,645.26 |
| 24 | February 16, 2023 | January 31, 2023 | $181,582,018.43 | $14,726.29 |

37.   Based on my comparison of the purported BROKER 1 account statements that ALHUSSEINI submitted and the true records from BROKER 1, I know that, in addition to providing false portfolio value information, ALHUSSEINI's falsified BROKER 1 account statements also included other errors, such as future-dated account statements, formatting inconsistencies, and spelling errors.

38.  Nearly all of the transmissions noted above were accompanied by a certificate of compliance, in which ALHUSSEINI affirmed by electronic signature that the BROKER 1 account statements, among other statements, were "in each

11

case true, correct and complete copies." These representations were materially false because the BROKER 1 account statement balances had been altered as described above.

E.  **BORROWER 1 Defaults on the Loan and ALHUSSEINI Evades INVESTOR FUND B's Attempts to Enforce the November 2021 Put Option**

39. On or about July 14, 2023, INVESTOR FUND B sued ALHUSSEINI in New York state court to enforce the terms of the put option. I have reviewed some of INVESTOR FUND B's state court filings, including exhibits of letters and emails between the parties, contract terms, and sworn affidavits. In summary, the filings set out the following timeline:

a.  On or about November 2, 2022, INVESTOR FUND B sent to ALHUSSEINI a notice of BORROWER 1's failure to make a loan payment, which was a default under the terms of the $145 million loan.

b.  On or about December 5, 2022, INVESTOR FUND B and ALHUSSEINI amended the November 2021 put option. The parties agree that in consideration of INVESTOR FUND B's forbearance of BORROWER 1's partial default, ALHUSSEINI would increase the payment obligation on the November 2021 put option from $65 million to $75 million.

c.  On or about April 17, 2023, INVESTOR FUND B sent to ALHUSSEINI a foreclosure notice for BORROWER 1's default under the terms of the $145 million loan.

d.    On or about June 27, 2023, INVESTOR FUND B exercised the November 2021 put option that contractually required ALHUSSEINI to pay INVESTOR FUND B $75 million in exchange for approximately 10.3 million shares of COMPANY A stock.

e.    On or about July 12, 2023, INVESTOR FUND B sent to ALHUSSEINI a notice of failure to pay and a demand for payment.

f.    On or about July 14, 2023, INVESTOR FUND B filed a lawsuit in New York state court against ALHUSSEINI for failing to pay $75 million to INVESTOR FUND B pursuant to the terms of the November 2021 put option.

g.    On or about September 11, 2023, the New York state court granted INVESTOR FUND B's motion for summary judgment and held that ALHUSSEINI was obligated to pay INVESTOR FUND B $75 million.

40.    I have spoken with legal representatives for INVESTOR FUND B, who told me that ALHUSSEINI has stopped responding to INVESTOR FUND B's inquiries, has fired his litigation counsel, and will not provide a means for INVESTOR FUND B to serve ALHUSSEINI with process in connection with the ongoing civil litigation.

## V. CONCLUSION

41.    As a result of ALHUSSEINI's fraud, INVESTOR FUND B had losses in excess of $150 million, including interest and penalties, and ALHUSSEINI personally received more than $12 million in ill-gotten gains.

42.   For all of the reasons described above, there is probable cause to believe that ALHUSSEINI has committed securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 8th day of October 2024.

_____
HONORABLE ALKA SAGAR
UNITED STATES MAGISTRATE JUDGE

14